**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **STEPHEN S. HOSICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10 CV 5132** |
| | ) | |
| **CHICAGO STATE UNIVERSITY** | ) | **Judge John Z. Lee** |
| **BOARD OF TRUSTEES, LEON** | ) | |
| **FINNEY, Jr., SANDRA WESTBROOKS** | ) | |
| **(in her individual and official capacity),** | ) | |
| **and ERMA BROOK WILLIAMS (in her** | ) | |
| **individual and official capacity),** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephen Seth Hosick, a former employee of Chicago State University ("CSU"), has sued the CSU Board of Trustees ("Board"), former Board chairman Dr. Leon Finney, CSU Provost Sandra Westbrooks in her individual and official capacity, and Erma Brooks Williams, the liaison between the Board and the CSU administration, in her individual and official capacity. Hosick alleges he was terminated based on racial and gender discrimination and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 1981, the Illinois Civil Rights Act ("ICRA"), and the Illinois State Official and Employees Ethics Act ("Ethics Act").[1] Defendants contend that Hosick was fired as part of a broad effort to enforce the Board's

---

[1] The Court previously dismissed Hosick's claims against CSU and CSU Board members Betsy Hill, Peggy Montes, and Richard Tolliver and his claims brought under the Illinois State Constitution and the law creating CSU, 110 Ill. Comp. Stat. 660/5. The remaining claims include:

    (1) Claims against the CSU Board for racial and gender discrimination under Title VII and racial discrimination under the ICRA;

    (2) Claims against Finney, Westbrooks (in her individual and official capacity), and Williams (in her individual and official capacity) for racial discrimination under § 1981; and

    (3) Claims against Westbrooks and Finney for retaliation under the Ethics Act.

personnel directives, protect CSU's budget, and ensure the incoming CSU president flexibility to select his own staff. Defendants have moved for summary judgment on all claims. For the reasons stated herein, the Court grants Defendants' motion.

## Facts

The following facts are undisputed. In 2008, Chicago State University, a public university in Illinois, was in financial trouble. (Defs.' LR 56.1(a)(3) ¶ 13.) The Illinois Auditor General had made over forty adverse material audit findings relating to the university's financial mismanagement. (*Id.*) Because of the Auditor General's findings, the CSU Board, the body charged with operating, managing, controlling, and maintaining CSU under Illinois law, decided not to renew the contract of CSU's president, Dr. Elnora Daniel. (*Id.* ¶¶ 13-14.) On June 30, 2008, Daniel's contract expired, and she left the university. (*Id.*) Rather than hire a permanent president on short notice, the Board decided to conduct a search to replace Daniel, with the goal of hiring a new, permanent president to start a year later, on July 1, 2009. (*Id.* ¶ 15.)

In the interim, the Board retained an executive search firm to find a one-year Interim President. The Interim President would have more limited authority than a permanent president, particularly with respect to the appointment of senior executive level personnel, whom the Interim President would be able to appoint only after consulting the Board. (*Id.* ¶ 16.) During the search for a permanent president, the Interim President was expected to serve as a consultant and to maintain the status quo with respect to senior level personnel at CSU. (*Id.* ¶ 17.) Such restrictions on personnel appointment authority were intended to permit the person selected for the permanent president position to retain flexibility to appoint his or her own staff and implement his or her vision for CSU without the constraints, inefficiencies, and potential intra-personal backlash that could develop from having to remove employees appointed by the Interim

President. (*Id.*) The Board also limited the Interim President's hiring authority to minimize the number of personnel decisions that would impact CSU's budget beyond the Interim President's one-year term. (*Id.* ¶ 18.)

On July 15, 2008, Dr. Frank Pogue began serving as the Interim CSU President. (*Id.* ¶ 21.) Despite the restrictions on his appointment authority, on October 16, 2008, Pogue hired Dr. Howard Johnson, an African-American male, to become CSU's Interim Vice President for Student Affairs, a senior executive position. (*Id.* ¶¶ 27, 78.) Pogue did this without consulting the Board. (*Id.* ¶ 27.) By late 2008, Pogue had also initiated a search for a new Vice President for Finance and Administration. (*Id.* ¶ 29.) At a December 2008 Board meeting, Pogue informed the Board of his search and proposed to hire a candidate. (*Id.*) The Board denied his request and instructed him not to hire anyone for that position so that the future president could select someone of his or her own choosing. (*Id.*) On March 2, 2009, again without consulting the Board, Pogue hired Plaintiff Stephen Seth Hosick, a white male, to serve as CSU's Director of Human Resources. (*Id.* ¶ 6.)

Board Chairman Finney grew concerned that Pogue was not merely maintaining the status quo but was attempting to hire additional personnel for executive positions and senior management roles that would impede the future permanent president's ability to lead the university. (*Id.* ¶ 31.) On March 4, 2009, Finney was directed to testify before the Illinois General Assembly's Legislative Audit Commission, the body responsible for appropriating public funds for CSU's budget. (*Id.* ¶ 37.) At the hearing, Finney received substantial criticism from the legislative committee members about the Board's lax protection of CSU's assets in the waning months of Daniel's leadership. (*Id.* ¶ 32.) In light of growing concerns regarding Pogue's hiring efforts and in response to the General Assembly's comments, the Board

determined that it needed to take a greater role in overseeing the management and operations of CSU during the presidential transition and in communicating with Pogue. (*Id.* ¶ 33.)

On March 11, 2009, a week after Finney testified before the Commission, the Board met and approved a resolution directing all contracts in excess of $25,000 be approved by the Board prior to execution (prior to this resolution, the Board's Regulations and Bylaws required that the Board approve contracts only in excess of $250,000). (*Id.* ¶¶ 34, 36.) Also on that day, Finney sent a letter to Pogue requiring Board consultation and approval for any new personnel appointments. (*Id.* ¶¶ 34, 36-37.) The letter to Pogue referenced the March 4, 2009 hearing before the General Assembly and the substantial criticism Finney received at the hearing regarding the Board's perceived failure to carefully operate, manage, and control the university. (*Id.* ¶ 37.) Pogue did not convey the letter's contents to his senior staff, and the CSU administration continued to hire people without seeking Board review. (*Id.* ¶¶ 41, 43.)

In April 2009, the Board selected Dr. Wayne Watson to be the new permanent CSU president. (*Id.* ¶ 40.) Watson did not start his tenure as CSU's president, however, until October 1, 2009. (*Id.* ¶ 85.)

On May 4, 2009, Finney met with CSU Provost Sandra Westbrooks and Erma Brooks Williams, the liaison between the Board and the CSU administration, to discuss why the March 11, 2009 hiring directive to Pogue had not been followed. (*Id.* ¶¶ 41, 43.) Upon learning that Pogue had not conveyed the directive to his senior staff, Finney requested that Hosick provide him with (1) information regarding all individuals who had been hired, transferred, or promoted after the March directive, and (2) regular notifications going forward for any proposed hires, transfers, or promotions. (*Id.* ¶ 43.) Finney's goals in requesting this information were to make administrative hires "totally transparent" during the waning months of Pogue's term as Interim

President and understand the extent of appointments made without Board approval after the March 11, 2009 directive. (*Id.* ¶ 43.) At the time of Finney's request, he knew that, based on the extent of the appointments that had occurred under Pogue's watch, he would likely dismiss several senior level administrators in order to accomplish the Board's goal of giving Watson the maximum flexibility to organize his own staff and administer CSU. (*Id.* ¶¶ 40, 44.) The next day, May 5, 2009, Hosick prepared and delivered to Finney a list of all administrative and faculty appointments that had been made after the March 11 directive. (*Id.* ¶ 46.) Hosick prepared similar reports for Finney throughout May and early June 2009. (Pl.'s LR 56.1(b)(3)(C) ¶ 8.)

At this point, Plaintiff's and Defendants' accounts of events diverge. Defendants' contend that by May 21, 2009, Finney had decided that the Board should reverse many of Pogue's appointment decisions by terminating certain employees from administrative posts before Watson assumed his duties as CSU president. (Defs.' LR 56.1(a)(3) ¶ 50.) Specifically, Defendants contend, Finney determined that at least five employees, all in positions that were part of the President's Executive Council, the inner circle of advisors, should be terminated from their administrative posts, including:

(1) Stephen Hosick, Director of Human Resources (who is a white male);
(2) Howard Johnson, Interim Vice President for Student Affairs (who is a black male);
(3) Patricia Arnold, Executive Director of University Relations (who is a black female);
(4) Katey Assem, Interim Vice President for Institutional Advancement (who is a black male); and
(5) Beverly John, Associate to the President for Special Programs (who is a black female).

(*Id.* ¶¶ 50, 77-78, 80;[2] Pl.'s LR 56.1(b)(3)(C) ¶ 4.)

---

[2] Plaintiff's LR 56.1(b)(3)(B) Response disputes the facts in paragraphs 77 and 80 of Defs.' LR 56.1(a)(3) Statement solely because "the fact is not supported by the documents behind Tab I." (Pl.'s 56(b)(3)(B) ¶¶ 77, 80.) In their Reply Brief, Defendants note that the supporting materials intended to appear behind "Tab I" were inadvertently mis-sequenced and appeared behind "Tab J." (Defs.'

Plaintiff contends that Defendants' contention that Finney decided to terminate Hosick by late May 2009 is supported by only Finney's own declaration, and that the only undisputed fact regarding the timing of Hosick's termination is that Westbrooks, in her capacity as the Senior Administrative Officer of CSU, terminated Hosick on July 13, 2009. (Pl.'s LR 56.1(b)(3)(C) ¶ 13.)

Putting aside the disputed fact of when Finney decided to terminate Hosick, the undisputed facts are as follows. On June 16, 2009, Finney learned that Hosick was continuing to conduct searches for various managerial positions, including the Chief of University Police position. (Defs.' LR 56.1(a)(3) ¶ 61.) Finney directed Board liaison Williams to inform Hosick to stop all personnel searches, including the search for a Chief of Police. (*Id.* ¶ 62.) As a result of this directive, the incumbent Interim Chief of Police, James Maddux, whom Finney knew to be a white male, remained in the Chief of Police position for an extra year. (*Id.*) Finney also directed Williams to gather information regarding people who had been hired, promoted, or transferred after the March 11 directive without consultation with the Board, so that he could supplement and confirm the lists provided by Hosick and determine whether to terminate such appointments. (*Id.* ¶ 63.)

The next day, June 17, 2009, Williams emailed Hosick informing him, "Any administrative hires and other hires that are done with the expectation of permanent employment will be reviewed and possibly rescinded by the Board." (*Id.* ¶ 64.) In response, on June 18, 2009, Hosick sent an email to Finney, Westbrooks, Williams, the rest of the Board and the Board's legal counsel in which he stated that he was sending information regarding Finney and

Reply Br. n.2.) That is, the supporting materials intended to appear behind "Tab I" actually appeared behind "Tab J" and vice versa; the tabs were switched. Thus, the facts in paragraphs 77 and 80 are supported by the materials behind "Tab J." A careful reading of the appendix to the Defendants' 56.1(a)(3) Statement reveals this clerical error. Because Plaintiff does not raise any substantive disputes with the facts in ¶¶ 77 and 80, the facts are deemed admitted for the purposes of this motion.

the Board's involvement in the day-to-day administration of CSU to the Office of the Executive Inspector General ("OEIG") and the Illinois Auditor General ("IAG"). (*Id.* ¶ 96.) Hosick added that he would be asking these offices to conduct an independent investigation into Finney and the Board's conduct. (*Id.* ¶ 96.) That same day, Hosick sent a letter of complaint to the OEIG and IAG. (*Id.* ¶ 97.)

Sometime after Hosick filed the complaints, Finney met with Westbrooks in late June 2009 after Westbrooks had reviewed the information Finney had requested regarding the appointment of personnel after the March 11 directive. (*Id.* ¶ 67.) At the meeting, Westbrooks recommended, and Finney decided, to terminate the administrative position of Shellisa Rodriguez, assistant to the Director of Human Resources, because she had been hired after and in contravention of the March 11 hiring directive, and Finney believed it would be important for Watson to fill her position with someone of his choosing. (*Id.* ¶¶ 67-68.) Finney and Westbrooks also discussed the employment status and procedural rights due upon termination of Hosick, Howard Johnson, the Interim Vice President for Student Affairs, and Patricia Arnold, the Executive Director of University Relations. (*Id.* ¶ 71.) Finney then approved terminations, with three-months notice, for each of these four employees: Hosick, Johnson, Arnold, and Rodriguez. (*Id.* ¶ 72.) Westbrooks analyzed the rest of the list of people hired after the March 11 directive and decided that the others would not be terminated from their appointments because they were either (1) on grant-funded positions, which did not impact the university's budgetary constraints because salaries for such positions were funded by sources outside the university, (2) under contracts that would expire by June 30, 2009, or (3) were in critical positions that should not be left vacant. (*Id.* ¶¶ 46, 70.)

In July 2009, Westbrooks issued the following letters of termination:

(1) July 1, 2009: Shelissa Rodriguez;
(2) July 2, 2009: Patricia Arnold;
(3) July 10, 2009: Howard Johnson;
(4) July 13, 2009: Stephen Hosick;
(5) July 20, 2009: Beverly John, Associate to the President for Special Program; and
(6) July 24, 2009: Katey Assem, Interim Vice President for Institutional Advancement.

(*Id.* ¶¶ 54-55, 74, 77-78, 80.)

It is undisputed that Finney terminated Johnson, Arnold, Rodriguez, and John because he believed that it was important for Watson to fill their positions. (*Id.* ¶¶ 52-53, 68.) Finney terminated Assem because Assem was paid to perform duties for the CSU Foundation, an organization for which Assem served as Executive Director, and Finney believed the Foundation itself should pay Assem's salary. (*Id.* ¶ 54.)

In total, CSU terminated six people from their administrative positions in July 2009: one white male (Hosick), two black males (Johnson and Assem), and three black females (Arnold, John, and Rodriguez). (*Id.* ¶¶ 77-78, 80-81; Pl.'s LR 56.1(b)(3)(C) ¶ 4.) Four of the six employees terminated (Hosick, Johnson, Arnold, and Rodriguez) left CSU after their termination and two remained at the university, but in different positions – John resumed her role as a tenured CSU professor, and Assem was reassigned to the position of Executive Director for the CSU Foundation. (Defs.' LR 56.1(a)(3) ¶ 80.) Williams and Watson did not participate in any of the six termination decisions. (*Id.* ¶ 81.)

In August 2009, a search committee was initiated for a new Director of Human Resources. (*Id.* ¶ 84.) On October 1, 2009, Watson, who then had taken up his position as the permanent CSU president, hired Renee Mitchell, a black female, as Director of Human Resources. (*Id.* ¶¶ 85-86.) Watson hired Mitchell because Westbrooks recommended her and she had extensive experience in human resources from working for different companies over several decades and had earned a PhD in the field. (*Id.* ¶ 86.)

In August 2010, Hosick sued CSU, the Board, Finney, Westbrooks, and Williams, alleging that he was terminated based on his race (white), his gender (male), and in retaliation for filing a complaint to the OEIG and IAG. (*Id.* ¶ 90.) None of the other five employees terminated from their administrative positions in July 2009 complained to the OEIG or IAG. (*Id.* ¶ 6, 97.) Defendants have moved for summary judgment on all claims.

## Discussion

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *Id.* at 321-22.

### I.      Title VII and ICRA Race Discrimination Claims

Hosick alleges that the CSU Board engaged in racial discrimination in violation of Title VII of the Civil Rights Act and the ICRA. When a non-discrimination statute, like the ICRA, says nothing about the burden of proof, courts look to Title VII case law for guidance. *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 616 (7th Cir. 1998). Thus, the analysis is the same for Hosick's racial discrimination claims under Title VII and the ICRA.

To overcome Defendants' motion for summary judgment, Hosick may proceed under either the direct or indirect method of proving that Defendants took an adverse employment action against him because of his race. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Hosick does not attempt to establish discrimination via the direct method. Accordingly,

if he is to survive Defendants' motion for summary judgment on his race discrimination claims, he must do so under the indirect method.

The indirect method requires Hosick to proceed under the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973). *See McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009). The *McDonnell Douglas* test requires that, to survive summary judgment, Hosick must establish a *prima facie* case of discriminatory termination by showing that: (1) he is a member of a protected class; (2) he was performing well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside his protected class were treated more favorably. *Id.* Because Hosick, a white male, pursues reverse-discrimination claims, *i.e.*, claims brought by a white plaintiff or a man, he must prove, in lieu of the first prong, the existence of "background circumstances" or "something fishy" about the facts at hand suggesting that anti-majority discrimination has occurred. *See Mills v. Health Care Service Corp.*, 171 F.3d 450, 455-57 (7th Cir. 1999). If Hosick makes this *prima facie* showing, the burden shifts to the Defendants to articulate a legitimate, non-discriminatory reason for Hosick's termination. *See id.* at 454. If the Defendants can articulate such a reason, the burden of production shifts back to Hosick to show that the Defendants' stated reason is a pretext. *See id.* In this context, a pretext is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

It is undisputed that Hosick satisfies the second and third prongs of the *prima facie* case requirement. Hosick met the legitimate expectations of his role as Director of Human Resources and he was terminated from his position on July 13, 2009. (Pl.'s LR 56.1(b)(3)(C) ¶¶ 13, 15). Defendants argue, however, that Hosick has failed to create a triable issue of fact as to prongs

one and four because he cannot establish: (1) the existence of background circumstances or "something fishy" which gives rise to an inference of race discrimination, or (2) that similarly situated employees outside his protected class were treated more favorably. The Court agrees that Hosick cannot satisfy prong one of his *prima facie* case and, therefore, cannot survive summary judgment. Because Hosick cannot survive summary judgment without satisfying prong one, *see McGowan*, 581 F.3d at 579, there is no need to address prong four.

### A. Background Circumstances

The Seventh Circuit first adopted the "background circumstances" approach in reverse discrimination cases in *Mills v. Health Care Service Corp*. There, the Court reasoned that because the plaintiff was a white male, he "clearly does not satisfy prong one" of the *McDonnell-Douglas* burden-shifting test, but the Court recognized that it was "well settled law that the protections of Title VII are not limited to members of historically discriminated-against groups." 171 F.3d at 454. Operating from the premise that "invidious discrimination against white [men] is relatively uncommon in our society, and so there is nothing inherently suspicious in an employer's decision to promote a qualified minority [or female] applicant instead of a qualified white [male] applicant," the Court concluded that it was appropriate to modify the *McDonnell-Douglas prima facie* test to require white male plaintiffs to demonstrate "background circumstances" indicating that the employer had some reason or inclination to discriminate invidiously against whites or men. *Id.* at 455 (quoting *Harding v. Gray*, 9 F.3d 150, 152-53 (D.C. Cir. 1993)). Adding this element for whites and men would require these majority-group

plaintiffs to show at the outset the same burden imposed on minorities or women by the fact that

minorities and women are members of historically discriminated-against groups.[3] *Id.*

Whether background circumstances exist sufficient to give rise to an "inference that the

defendant is one of those unusual employers who discriminates against the majority" is a fact-

based inquiry. *Mills*, 171 F.3d at 455. Indeed, in *Mills*, the Seventh Circuit noted that "[t]he

contours of what constitutes a background circumstance are not precise." *Id.* The *Mills* Court

provided a variety of factual situations that, if supported by plaintiff's evidence, would support a

finding of an inference of discrimination. For example, fixing performance ratings to the

detriment of whites or men, departing from the usual hiring procedures in an "unprecedented

fashion" to the disadvantage of white plaintiffs, or passing over white candidates in promotion

decisions despite the superior qualifications of those candidates were all adequate showings that

something was "fishy." *Mills*, 171 F.3d at 455 (citing *Harding*, 9 F.3d at 154). Similarly, if the

person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed

intense interest in hiring a woman, and there was a pattern of hiring women in the past, a male

plaintiff could establish "background circumstances." *Id.* Finally, if a plaintiff was the only

white employee in a department and nearly all of the decision makers were Hispanic, sufficient

"background circumstances" could also exist. *Id.* Each of these examples, the Seventh Circuit

held, "support[ed] an inference that the defendant is one of those unusual employers who

---

[3] Other circuits have adopted the "background circumstances" approach in reverse discrimination cases. *See, e.g.*, *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1141 (10th Cir. 2008); *Woods v. Perry*, 375 F.3d 671, 673 (8th Cir. 2004); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003); *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012 (D.C Cir. 1981). Not all circuits, however, have adopted the approach. *See, e.g.*, *Iadimarco v. Runyon*, 190 F.3d 151, 160 (3d Cir. 1999) (rejecting the "background circumstances" analysis); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426 (5th Cir. 2000) (holding that a plaintiff in a reverse discrimination case need show only that he is a member of "a protected group" and whites are a protected group under Title VII).

discriminates against the majority," and thus shifted the burden of production to the defendant to articulate a legitimate reason for its employment action. *Id.*

Since *Mills*, the Seventh Circuit has held that a variety of other factual situations can constitute "background circumstances" or something "fishy" sufficient to give rise to an inference of discrimination. *See, e.g.*, *Hague v. Thompson Dist. Co.*, 436 F.3d 816, 822 (7th Cir. 2006) ("background circumstances" existed when five plaintiffs, the only whites at a company, presented evidence that their black boss fired them and replaced three of them with black employees, the fourth's job was assumed by a black employee, and the fifth was not replaced); *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009) ("background circumstances" could exist where a black police chief referred to the plaintiff as one of "these old white mother f---ers" approximately fifteen times over a three-year period); *Balance v. City of Springfield*, 424 F.3d 614, 618 (7th Cir. 2005) ("background circumstances" existed where a law firm report conducted to investigate racism in the police department concluded that "race and gender are taken into consideration at various stages, including hiring, work assignments, promotion, and determination of disciplinary action or determination of the need for an internal affairs investigation.")

The Seventh Circuit has also identified instances where plaintiffs have failed to demonstrate sufficient "background circumstances." *See, e.g.*, *Phelan v. City of Chi.*, 347 F.3d 679, 685 (7th Cir. 2003) (no "background circumstances" where plaintiff, his superiors, and his replacement were all white); *Good v. Univ. of Chi. Med. Cntr.*, 673 F.3d 670, 679 (7th Cir. 2012) (same); *Gore v. Ind. Univ.*, 416 F.3d 590, 593 (7th Cir. 2005) (no "background circumstances" where male plaintiff had no basis to believe he was more qualified than the candidates that were

ultimately hired, a man appointed the hiring committee, which consisted of mostly men, and the committee hired a man before it later hired two women).

Here, Hosick has not produced sufficient evidence of background circumstances demonstrating that Defendants were motivated to discriminate against whites. When Hosick was terminated from his administrative position at CSU in July 2009, five other employees, all African-American, were also terminated from their administrative positions. (Defs.' LR 56.1(a)(3) ¶¶ 77-80.) Additionally, in June 2009, Board chairman Finney directed Hosick to stop conducting a search for a new Chief of Police, allowing the incumbent Interim Chief of Police, James Maddux, to remain in the Chief of Police position for an extra year. (*Id.* ¶62.) Maddux is a white man, and Finney was aware of Maddux's race. (*Id.*) These actions do not create an inference or something "fishy" suggesting that Defendants were motivated by race discrimination against whites.

Hosick nevertheless argues that sufficient background circumstances exist because CSU is a historically black university with "a long history of, and preference for, hiring African-Americans." (Pl.'s Resp. 14.) But Hosick's statement of facts cites no evidence to support these assertions, other than his own declaration. (Pl.'s LR 56.1(b)(3)(C) ¶ 1). Such conclusory assertions are insufficient to establish these facts. *See Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("[i]t is well settled that conclusory allegations of self-serving affidavits, without support in the record, do not create triable issues of fact.") Indeed, Rule 56(c)(4) states that "declarations used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (noting that affidavits based on personal knowledge may

include reasonable inferences, so long as those inferences are based on observation or first-hand experience). Hosick provides no basis, not even his own personal observations, for the facts he asserts about CSU's racial makeup, history, or hiring preferences. His bare assertions do not create triable issues of fact.

Hosick also argues that sufficient background circumstances exist because 95% of CSU's faculty and staff were African-American and the Board consisted of only African-Americans when he was terminated. (Pl.'s Resp. 14.) Again, his statement of facts cites no evidence, other than his own conclusory assertions, to support these facts. (Pl.'s LR 56.1(b)(3)(C) ¶¶ 1-2.) Moreover, even if the Court were to accept these statistics about the racial composition of the CSU faculty and staff, statistics standing virtually alone are improper vehicles to prove discrimination. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (7th Cir. 2002). A plaintiff must do more than merely point to race and proclaim: "Aha! Discrimination." *Hague*, 436 F.3d at 829. If a plaintiff relies on the racial composition of a workforce as evidence of discrimination, the plaintiff must "subject all of the employer's decisions to statistical analysis to find out whether [race] makes a difference." *Id.* at 829 (quoting *Millbrook*, 280 F.3d at 1177).

Here, Hosick's has conducted no such statistical analysis and his bare statistical observations about the overall racial composition of CSU's faculty and staff do not, standing alone, create an inference of discrimination. First, his general statistics fail to capture the applicant pool for faculty and staff positions at CSU. Suppose 1,000 individuals apply for 100 faculty and staff positions at CSU; 150 of the applicants are white and 850 black. If all are equally qualified and CSU ignores race, then roughly 15 white workers and 85 black workers will be hired. No discrimination would have occurred, but blacks still would vastly outnumber whites. *See Baylie v. Fed. Reserve Bank of Chi.*, 476 F.3d 522, 524-25 (7th Cir. 2007)

(explaining the limited usefulness of statistics in a single-plaintiff discrimination case). Second, Hosick's general statistics ignore the relative qualifications of those who apply for positions at CSU. If black applicants applying for positions at CSU are relatively more qualified than white applicants applying for the same positions, then CSU's faculty and staff could be composed of more blacks due to these qualifications, not race discrimination. Without any statistical analysis, the raw racial composition of CSU's faculty and staff is "next to worthless." *See Hague*, 436 F.3d at 829 (finding plaintiffs' race discrimination claim based, in part, on the fact that plaintiffs were the only whites at the company was "next to worthless" without an analysis of the number, race, and relative qualifications of candidates applying for positions at the company) (citing *Odom*, 3 F.3d at 849 (raw data of age, race, and locations of persons promoted from 1980-1983 "without more, is not competent to prove anything")). *See also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) ("Statistical evidence which fails to take into account nondiscriminatory explanations does not permit an inference of discrimination.") (internal citations omitted).[4]

Additionally, even if the Court accepts that the Board consisted of only African-Americans when Hosick was terminated, a fact disputed by Defendants,[5] the predominance of minority supervisors, standing alone, is not sufficient to create an inference of racially

---

[4] Although the merit of statistical analysis in employment discrimination cases is typically discussed in the context of whether a plaintiff can demonstrate pretext, the third step of the *McDonnell Douglas* burden-shifting analysis, the discussion is equally helpful in the context of whether a plaintiff in a reverse discrimination case can establish "background circumstances" using statistical evidence. To establish pretext, a plaintiff must produce evidence from which a rational trier of fact could infer that the employer lied about its proffered reasons for the employment action and took the action because of race discrimination against the majority. *Mills*, 171 F.3d at 454-58. In much the same way, to establish "background circumstances," a plaintiff must create an inference that the defendant discriminates against the majority. *Id.*

[5] Defendants contend that Betsy Hill, a Board member when Hosick was terminated, is Caucasian (Defs.' Resp. Pl.'s 56.1(b)(3)(C) ¶ 2.)

discriminatory background circumstances. *Sendra v. Potter*, 833 F. Supp. 2d 846, 852-53 (N.D. Ill. 2011) (no "background circumstances" where six of sixteen hired workers were non-blacks and the black employer hired a black employee instead of the white plaintiff). *See also Lupescu v. Napolitano*, 700 F. Supp. 2d 962, 974 (N.D. Ill. 2010) (citing *Plummer v. Bolger*, 559 F. Supp. 324, 329 (D.D.C. 1983), *aff'd without op.*, 721 F.2d 1424 (D.C. Cir. 1983), *and Heasley v. D.C. Gen. Hosp.*, 180 F. Supp. 2d 158, 171 (D.D.C. 2002)); *Shoultz v. Ill. State Univ.*, No. 10-CV-1046, 2011 WL 6010235, at*9 (C.D. Ill. Dec. 1, 2011).

In short, Hosick has failed to produce evidence of background circumstances or anything "fishy" that demonstrates that Defendants had some reason or inclination to discriminate against whites. Because Hosick cannot show sufficient background circumstances evidencing an inference of discrimination, he cannot establish a *prima facie* case of reverse discrimination and, therefore, cannot survive summary judgment on his race discrimination claims.[6]

### B. Pretext

Even if Hosick could make a *prima facie* case of race discrimination under the indirect method, his reverse race discrimination claims cannot proceed for a separate and independent reason: Defendants provide legitimate, nondiscriminatory reasons for Hosick's termination, and Hosick cannot prove that these reasons are a pretext for race discrimination. Under the *McDonnell Douglas* burden-shifting analysis, once Hosick makes a *prima facie* showing, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for Hosick's termination. *See McGowan*, 581 F.3d at 579. If Defendants offer a legitimate, nondiscriminatory reason for the termination, Hosick can survive summary judgment only by proving that the employer's legitimate, nondiscriminatory reason is merely a pretext for

---

[6] Hosick also alleges that the timing of the March 2009 hiring directive provides sufficient background circumstances to satisfy the first prong of his *prima facie* case. The Court disagrees and addresses this argument in more detail in a discussion of pretext in Section I.B.

discrimination.  *See Id.*  In this context, pretext "means a dishonest explanation, a lie rather than an oddity or an error."  *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).  "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks."  *Id.* at 684.  If the employer honestly believed the reasons it gave for taking the adverse employment action against the plaintiff, the plaintiff cannot establish pretext, even if the employer's reasons were mistaken, cruel, unethical, or downright irrational.  *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006).

Defendants contend that Hosick was terminated because he held one of several positions that were important for the new, permanent CSU president to fill with one of his own hires. Defendants argue that the Board believed that one of the permanent president's first priorities would be to recruit and organize his staff, and that the new president should select his own Director of Human Resources to lead that function.  (Defs.' Br. Supp. Summ. J. 12.)  As support for this contention, Defendants note that six employees were terminated from their administrative positions in July 2009, including Hosick, and the undisputed facts show that the other five employees were terminated with the goals of (1) remedying and preventing the harmful personnel and financial decisions Daniel made prior to her departure, and (2) avoiding encumbering the incoming permanent president with the burden of clearing out unauthorized senior leadership commitments.  (Defs.' LR 56.1(a)(3) ¶¶ 52-55, 68.)

Hosick argues that these reasons are pretextual and that he was really fired because he is white.  Specifically, he contends that the Board's March 11 directive and Finney's letter to Pogue requiring Pogue and his administration to obtain Board approval before hiring any additional employees was "unprecedented" and was triggered not by financial or administrative

concerns, but by racial animus. Hosick argues that the timing of the directive – nine days after Pogue hired him – creates an inference of racial discrimination because Hosick was Pogue's first white administrative hire. Hosick also notes that on October 16, 2008, months before Pogue had hired Hosick, Pogue hired Howard Johnson, an African-American, for the position of Interim Vice President for Student Affairs. Hosick argues that if Finney and the Board were truly concerned about limiting Pogue's hiring abilities, they would have taken action after Pogue's hiring of Johnson or included such limitations in Pogue's contract.

Hosick's argument, however, ignores the fact that the Board did take action to limit Pogue's appointment authority before March 2009. It is undisputed that, as the Interim President, Pogue was hired with restrictions on his appointment authority and could appoint senior level executives only after prior consultation with the Board. (Defs.' LR 56.1(a)(3) ¶ 16.) It is also undisputed that the Board took further action to limit Pogue's hiring authority after he appointed Johnson without Board approval. (*Id.* ¶¶ 27-29.) Two months after Pogue hired Johnson, the Board blocked Pogue's request to hire a Vice President of Finance and Administration and instructed Pogue not to hire anyone for that position so that the future president could select someone of his or her own choosing. (*Id.*) All of these actions took place before Hosick was hired. (*Id.* ¶ 6.)

Additionally, Hosick ignores the legitimate, nondiscriminatory reasons for the timing of the Board's March 11, 2009 actions. Just a week earlier, on March 4, 2009, Finney was directed to testify before the Illinois General Assembly's Legislative Audit Commission. (*Id.* ¶ 32.) At the hearing before the Commission, Finney received substantial criticism from the legislative committee members accusing the Board of having been lax in protecting CSU's assets during the waning months of Daniel's leadership. (*Id.*) Finney's March 11 letter to Pogue stated that the

legislative hearing was a major reason for sending the letter. Additionally, Hosick does not dispute that in response to the legislative commission's comments and in light of growing concerns regarding Pogue's hiring efforts, the Board determined that it needed to take a greater role in overseeing the management and operations of CSU, with the goal of protecting the financial assets of the university, preventing the creation of additional personnel obligations or contract obligations during the waning months of Pogue's interim leadership, and ensuring that the future president would be in the best position to succeed. (*Id.* ¶¶ 32-33.)

Aside from the timing of the Board's March 11 directive and Finney's letter, Hosick offers no evidence that that Defendants' reasons for terminating a group of Pogue's appointments, including him, were pretextual efforts to hide race discrimination. In fact, Hosick offers no evidence that all of the Board members were even aware on March 11, 2009 that Hosick had been hired, let alone that the all of the members were aware of his race. Furthermore, Hosick acknowledged that by May 2009, Finney had decided that he would likely dismiss several senior level administrators that Pogue had appointed in order to give Watson maximum flexibility to organize his own staff, and that each of the other five employees terminated from their administrative positions in July 2009 were terminated for financial reasons or because they held positions that Finney believed were important for Watson to fill with someone of his choosing. (*Id.* ¶¶ 44, 52-55, 68.) Hosick also acknowledged that, based on his own experience, it was "extremely common" for a new president to bring in his or her own personnel when he or she assumes office and that a Human Resources Director would "absolutely" be among that personnel. (*Id.* ¶ 25.)

In sum, Hosick has provided no evidence that the Board's proffered reasons for terminating him were not the actual motivation for the decision. Thus, Hosick cannot establish

that Defendants' nondiscriminatory reasons for terminating him were pretext for race discrimination.  For these reasons, the Court grants Defendants' motion for summary judgment on Hosick's claims of race discrimination under Title VII and the ICRA.

## II.  § 1981 Race Discrimination Claims

Hosick also alleges that individual defendants Finney, Westbrooks, and Williams engaged in racial discrimination in violation of § 1981.  Finney, Westbrooks, and Williams argue that they are entitled to qualified immunity with regard to Hosick's § 1981 claims of race discrimination.  The doctrine of qualified immunity insulates public officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Van den Bosch v. Raemisch*, 658 F.3d 778, 786 (7th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  When evaluating a claim of qualified immunity, therefore, the court must ask whether "the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct."  *Id.*  The court has discretion in deciding which of the two prongs to address first.  *Id.*

Here, Finney, Westbrooks, and Williams are state-government officials sued for decisions they made while exercising discretion in the scope of their employment.  They concede that Hosick had a clearly established right to be free from race discrimination as part of his employment with CSU.  (Defs.' Br. Supp. Summ. J. 18.)  Thus, the issue is whether the facts alleged "make out a constitutional violation at all."  *Pearson*, 555 U.S. at 233.

As the above analysis demonstrates, Hosick has failed to show that the conduct of Finney, Westbrooks, and Williams violated clearly established constitutional rights of which a reasonable person in their situations would have been aware.  A reasonable Board chairman,

university Provost, and liaison between the Board and the university would have been aware, as Finney, Westbrooks, and Williams were, of hiring restrictions placed on an Interim President, violations of those restrictions, and a desire not to encumber an incoming permanent president with heavy financial or personnel commitments. A reasonable person would also not have thought that the actions taken to remedy those violations were a violation of Hosick's clearly established constitutional right to be free from race discrimination. Therefore, Defendants Finney, Westbrooks, and Williams are entitled to qualified immunity from Hosick's § 1981 claims.[7]

### III.  Gender Discrimination Claim

In addition to race discrimination, Hosick alleges that the Board discriminated against him because of his gender in violation of Title VII. Under Title VII, it is unlawful for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Like a Title VII race discrimination claim, a Title VII gender discrimination claim can survive summary judgment if the plaintiff presents either direct or circumstantial evidence of discrimination (the "direct method") or indirect evidence that establishes a *prima facie* case and

---

[7] Even if Defendant Williams were not entitled to qualified immunity on the only claim Hosick brings against her – race discrimination under § 1981 – she would nevertheless be entitled to summary judgment because she did not participate in the decision to terminate Hosick. Like Title VII, § 1981 prohibits discrimination against an employee and the same standards governing liability under Title VII apply to § 1981. *Thanongsinh v. Board of Educ.*, 462 F.3d 762, 782 (7th Cir. 2006). But § 1981 is limited in scope to discrimination on the grounds of race in the "mak[ing] and enforc[ing] of contracts." 42 U.S.C. § 1981(a). In the employment context, an individual may be held liable only if the individual was involved in the decision to take the adverse employment action. *See Alexander v. Wisc. Dep't of Health & Family Servs.*, 266 F.3d 673, 683-84 (7th Cir. 2001) (affirming summary judgment for two defendants on Plaintiff's § 1981 claims because Plaintiff "provid[ed] no facts indicating that either [of defendants] were involved in any capacity with the decision to suspend [plaintiff].") It is undisputed that Defendant Williams did not participate in the decision to terminate Hosick. (Defs.' LR 56.1(a)(3) ¶ 81.) Therefore, Williams is entitled to summary judgment on Hosick's § 1981 claim against her.

satisfies the *McDonnell Douglas* burden shifting test. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591-92 (7th Cir. 2008).

Hosick has failed to demonstrate gender discrimination under either the direct or indirect method. Hosick makes no argument in his response brief that he was terminated because of his gender. He makes no attempt to refute or even address any of the arguments raised by Defendants on this claim. He provides no explanation or analysis as to why or how Defendants discriminated against him based on his gender.

The only evidence Hosick has provided to support his claim that his termination was motivated by gender discrimination is the fact that the individual who was subsequently hired as Director of Human Resources, Renee Mitchell, was female. (Defs.' LR 56.1(a)(3) ¶ 94.) That one's replacement is of another sex is not, by itself, sufficient to raise an inference of gender discrimination. *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996).

Moreover, evidence pertaining to Hosick's replacement is even less relevant here because different decision makers were involved in the decision to terminate Hosick and hire Mitchell. Finney made the decision to terminate Hosick. (Defs.' LR 56.1(a)(3) ¶ 71-72.) But the new, permanent president, Watson, hired Hosick's replacement. (Defs.' LR 56.1(a)(3) ¶ 86; *Coleman v. Donahue*, 667 F.3d 835, 848 (7th Cir. 2012) ("The inference of discrimination is weaker when there are different decision-makers"); *Jackson v. Worldwide Flight Servs. Inc.*, No. 03 1940, 2004 WL 2203430, at *6 (N.D. Ill. Sept. 29, 2004) (finding characteristics of plaintiff's replacement did not support an inference of discrimination where the replacement was hired by someone other than the decision maker responsible for plaintiff's termination).

In response, Hosick argues that Finney was involved in hiring Mitchell because Finney requested that Westbrooks form a search committee to find candidates for the position of

Director of Human Resources.  (Pl.'s Resp. 10.)  The only evidence Hosick offers to support his claim that Finney told Westbrooks to form a search committee, however, is his own deposition testimony.  (Defs.' LR 56.1(a)(3) ¶ 89.)  In his deposition, Hosick stated that Westbrooks told him that Finney told Westbrooks to initiate the search committee.  (*Id.*)  This evidence is inadmissible hearsay.   Hosick  has  no  personal  knowledge  of  Finney's  involvement  and Westbrooks'  alleged  out  of  court  statement  cannot  serve  as  evidence  that  Finney  told Westbrooks to initiate a search committee.  Fed. R. Evid. 801, 802.  Hosick cannot, therefore, rely on it.  *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.")

Furthermore, three of the six employees terminated from their administrative posts in July 2009 were female.  (Defs.' LR 56.1(a)(3) ¶ 46, 53, 55.)  Such evidence taken together does not create an inference that Hosick was terminated due to gender discrimination.   For these reasons, summary judgment is granted on this claim.

### IV.    Retaliation Claim

Finally,  Hosick  asserts  that  Defendants  Westbrooks  and  Finney,  in  their  individual capacities, retaliated against him in violation of the whistleblower provisions of the Illinois State Official and Employees Ethics Act by terminating him after he filed complaints with the OEIG and IAG.   The Ethics Act prohibits retaliation based on a state employee's disclosure of an activity,  policy,  or  practice  that  the  employee  reasonably  believes  violates  a  law,  rule,  or regulation.  5 Ill. Comp. Stat. 430/15-10.  It is a violation of the Ethics Act if Hosick proves that (1) he engaged in protected conduct and (2) that such conduct was a "contributing factor" in his termination.  *Id.* 430/15-20.   It is not a violation, however, if it is demonstrated by clear and

convincing evidence that Hosick would have been terminated even if he had never complained to the OEIG or IAG.  *Id.*

Although the Ethics Act is a state statute and its interpretation is a matter of state law, the Illinois Supreme Court and Illinois appellate courts have not interpreted the provisions of the Ethics Act under which Hosick brings his claims.  When there is an absence of Illinois case law interpreting an Illinois statute, a court may look for guidance to federal cases interpreting an analogous federal statute.  *People v. Childress*, 789 N.E.2d 330, 341 (Ill. App. Ct. 2003).  Although the Seventh Circuit has not directly addressed the issue, because the anti-retaliation portion of the Ethics Act is analogous to the anti-retaliation portion of Title VII,[8] the Court considers judicial interpretations of Title VII in resolving the issues presented in this case, as other circuit courts have done in interpreting similar state anti-retaliation statutes.  *See, e.g.*, *Yancy v. U.S. Airways, Inc.*, 469 Fed. App'x 339, 343 n.4 (5th Cir. 2012) (noting that the *McDonnell-Douglas* approach used for Title VII retaliation claims applies to claims under Louisiana's whistleblower statute); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950-51 (11th Cir. 2000) (holding that the summary judgment analysis for a Title VII retaliation claim should be applied to a claim of retaliatory discharge under the Florida Whistleblower Act); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir. 1999) ("MWPA [Maine Whistleblowers' Protection Act] claims for retaliatory discharge, like Title VII claims, typically invite analysis under the framework first established by the Supreme Court in *McDonnell-Douglas*.")

---

[8] The Title VII anti-retaliation statute states, in pertinent part, that it is unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted or participated in" a Title VII "investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).  The Ethics Act states that a State employee "shall not take any retaliatory action against a State employee because the State employee…discloses…to a public body an activity, policy, or practice…that the State employee reasonably believes is in violation of a law, rule, or regulation.  5 ILCS 430/15-10.

### A. Prima Facie Case

Under Title VII, a plaintiff may establish retaliation under either the direct or indirect method of proof. *See Weber v. Univs. Resarch Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). To establish retaliation under the direct method, a plaintiff must present evidence, direct or circumstantial, showing that (1) he engaged in a statutorily protected activity, (2) he suffered a materially adverse action, and (3) a causal connection exists between the two. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). Finney and Westbrooks admit that Hosick engaged in protected conduct on June 18, 2009 by complaining to the OEIG and IAG. The parties also agree that Hosick's termination constitutes an adverse employment action. Finney and Westbrooks dispute only whether Hosick's protected conduct was a "contributing factor" in his termination. Thus, the issue before the Court is whether Hosick has created a triable issue as to whether his complaints to the OEIG and IAG led to his termination.

Under the direct method of proof, Hosick can rely on either direct or circumstantial evidence to show that Finney and Westbrooks were motivated to terminate him because of his protected activity. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 529 (7th Cir. 2003). Evidence of retaliation is direct when, "if believed by the trier of fact, [it] will prove the particular fact in question without reliance on inference or presumption." *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999) (internal quotations marks omitted). Hosick has not produced any direct evidence of a casual link between his complaints to the OEIG and IAG and his termination. Rather, Hosick relies on circumstantial evidence – the timing of the events surrounding his termination. (Defs.' LR 56.1(a)(3) ¶ 95.) Hosick complained to the OEIG and IAG on June 18, 2009, and received his notice of termination on July 13, 2009. (*Id.* ¶¶ 6, 97.) He argues that given the "short period" between his protected activity and the decision to

terminate him, a reasonable jury could find that his protected activity was a contributing factor in his termination.  (Pl.'s Resp. 6.)

Finney and Westbrooks argue that Hosick's complaints to the OEIG and IAG were not "contributing factors" in his termination because Finney decided to terminate Hosick in May 2009, a month before Hosick engaged in the protected activity of complaining to the OEIG and IAG on June 18, 2009.  (Defs. Summ. J. Mot. at 10.)  Employment decisions that precede an employee's protected activity cannot be retaliatory as a matter of law.  *Leonard v. E. Ill. Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) ("For a suspicious-timing retaliation theory, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act *precedes* the protected activity.") (emphasis in original).  But Hosick disputes this fact and contends that the decision to terminate him was made in "late June 2009."  (Pl.'s Resp. 6.)

It is well established that "mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue."  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone . . . does not support a reasonable inference of retaliation . . .").  Only in an "extreme case," where the adverse impact comes "on the heels" of the protected activity, is timing alone sufficient to establish a *prima facie* case of retaliation.  *See e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("very close" temporal proximity can suffice); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997) (two days);  *Simpsons v. Montgomery Ward & Co., Inc.*, No. 96-2386,

1997 WL 411230, at *4 (7th Cir. July 14, 1997) (ten days); *Holland v. Jefferson Nat. Life Ins.*
*Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) (one week).

Here, it is undisputed that the only evidence Hosick has offered to support his claim that
his termination was an act of retaliation is the timing of his termination. (Defs.' LR 56.1(a)(3)
¶ 95.) Construing the facts in the light most favorable to Hosick, we assume Finney decided to
terminate Hosick in "late June 2009," at most twelve days after Hosick complained to the OEIG
and IAG on June 18, 2009. (Pl.'s Resp. 6) The Court finds that such a short window of time
between Hosick's protected activity and the decision to terminate him is sufficient to raise an
inference of causation. Thus, Hosick has established a *prima facie* case of retaliation under the
direct method of proof. Because Hosick succeeds under the direct method, the Court does not
address the application of the indirect method.

### B. Non-Retaliatory Reason for Termination

Establishing a *prima facie* case, however, does not end the analysis. Under the Ethics
Act, a defendant is still entitled to summary judgment if it is demonstrated by clear and
convincing evidence that the plaintiff would have been terminated even if he had never
complained to the OEIG or IAG. *See* 5 Ill. Comp. Stat. 430/15-20. Similarly, under Title VII
law, once an employee has succeeded in making a *prima facie* case of retaliation, the burden of
production shifts to the employer to prove that the same action would have occurred in the
absence of the protected conduct. *Culver v. Gorman*, 416 F.3d 540, 546 (7th Cir. 2005).

As discussed with regard to Hosick's discrimination claims, Defendants have put forth
non-retaliatory reasons for Hosick's termination that are unrelated to Hosick himself, much less
his complaints to the OEIG or IAG. Hosick simply held a position that Finney believed Watson
should be able to fill with a person of Watson's own choosing. (Defs.' Br. Supp. Summ. J. 12.)

28

Indeed, five others were terminated from their administrative positions at CSU in July 2009, when Hosick was terminated, and it is undisputed that each of those five other employees were terminated for financial reasons or because they held positions that Finney believed were important for Watson to fill. (Defs.' LR 56.1(a)(3) ¶¶ 52-55, 68.) Hosick cites only his belief to establish that he was terminated for a different reason. (Pl.'s LR 56.1(b)(3)(B) ¶ 51.) Plaintiff's subjective belief alone is insufficient to create a triable issue. *See Horwitz v. Bd. of Educ. Avoca Sch. Dist. No. 37*, 260 F.3d 602, 615-16 (7th Cir. 2001) ("[plaintiff's] subjective belief that [defendant's] actions were retaliatory and that [defendant's] claimed reasons for terminating her are pretextual in nature does not create a genuine issue of material fact."); *Kizer v. Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992) (a "subjective belief or discrimination no matter how genuine, cannot be the sole basis for a finding of discrimination.")

Furthermore, it is undisputed that none of the other five employees in the other positions terminated in July 2009 had complained to the OEIG or engaged in other protected activity before they were terminated. (Defs.' LR 56.1(a)(3) ¶¶ 101-102.) *See Bottoms v. Ill. Dept. of Human Servs.*, No. 03 C 1881, 2007 WL 772895, at *10 (N.D. Ill. Mar. 9, 2007) (granting summary judgment and finding no evidence of retaliation where employer identified another employee terminated for same reasons as a plaintiff who had not engaged in protected activity). Thus, Finney and Westbrooks have satisfied their burden to rebut Hosick's *prima facie* case of retaliation by putting forth legitimate, non-retaliatory reasons for Hosick's termination.

### C. Pretext

In the last step of the analysis, if the employer establishes that the same employment action would have occurred even in the absence of the employee's protected conduct, the burden then shifts back to the employee to prove that the employer's stated reason is a mere pretext,

which means a phony reason for the employer's actions. *Rizzo v. Sheahan*, 266 F.3d 705, 715 (7th Cir. 2001); *Jackson*, 176 F.3d at 983. Hosick contends that the non-retaliatory reason Finney and Westbrooks give for Hosick's termination – that Hosick held a position that the new president should fill with someone of his own selection – is a pretext for retaliation because Finney did not ultimately allow Watson to recruit his own Director of Human Resources. (Pl.'s Resp. 10.) Rather, Hosick alleges, Finney involved himself with the search for a new Director of Human Resources by asking Westbrooks to form a search committee, Westbrooks interviewed Mitchell and recommended that she be hired as the new Director of Human Resources, and Watson simply signed a letter offering Mitchell the position on his first day of work. (*Id.*) But, as discussed above, there is no evidence that Finney made the decision to hire Mitchell, and the undisputed facts, including Watson's own testimony, show that Watson decided to hire Mitchell, and that he did so because of Mitchell's experience and qualifications in addition to Westbrooks' recommendation. (Defs.' LR 56.1(a)(3) ¶ 86.)

Hosick also argues that because some of Pogue's hires were allowed to remain employed by CSU, there is a question of fact about whether Hosick would have been allowed to remain employed by CSU had he not engaged in protected activity. (Pl.'s Resp. at 11.) But Finney's decision not to terminate all of Pogue's hires was a business judgment call based upon his understanding of each position's role and his sense of whether the incoming president would want to fill the position himself. (Defs.' LR 56.1(a)(3) ¶ 44.) Challenging a judgment call does not create a jury issue. *Hague*, 436 F.3d at 824 (attacks on "leadership and business judgment" to assert pretext "will not suffice.") Indeed, the Court is not a "super personnel review board" that second-guesses an employer's facially legitimate business decisions. *Culver*, 416 F.3d at 547. Instead, Hosick must submit evidence that Finney did not "honestly believe" that his goals

were best served by keeping some of Pogue's appointments and dismissing others. *Id.* at 823. Hosick has presented no such evidence.

In sum, Hosick has failed to create a triable issue as to whether he was terminated in retaliation for filing complaints with the OEIG and IAG. Thus, his retaliation claim against Westbrooks and Finney under the Ethics Act cannot survive summary judgment.

## V. Conclusion

For the reasons stated herein, the Court grants Defendants' motion for summary judgment [91] on all claims. This case is hereby terminated.

**SO ORDERED**                    **ENTER: 2/14/13**

**JOHN Z. LEE**
**U.S. District Judge**